(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLORIDA *v.* HARRIS

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 11–817.   Argued October 31, 2012—Decided February 19, 2013

Officer Wheetley pulled over respondent Harris for a routine traffic stop.  Observing Harris's nervousness and an open beer can, Wheetley sought consent to search Harris's truck.  When Harris refused, Wheetley executed a sniff test with his trained narcotics dog, Aldo. The dog alerted at the driver's-side door handle, leading Wheetley to conclude that he had probable cause for a search.  That search turned up nothing Aldo was trained to detect, but did reveal pseudoephedrine and other ingredients for manufacturing methamphetamine. Harris was arrested and charged with illegal possession of those ingredients.  In a subsequent stop while Harris was out on bail, Aldo again alerted on Harris's truck but nothing of interest was found.  At a suppression hearing, Wheetley testified about his and Aldo's extensive training in drug detection.  Harris's attorney did not contest the quality of that training, focusing instead on Aldo's certification and performance in the field, particularly in the two stops of Harris's truck.  The trial court denied the motion to suppress, but the Florida Supreme Court reversed.  It held that a wide array of evidence was always necessary to establish probable cause, including field-performance records showing how many times the dog has falsely alerted.  If an officer like Wheetley failed to keep such records, he could never have probable cause to think the dog a reliable indicator of drugs.

*Held*: Because training and testing records supported Aldo's reliability in detecting drugs and Harris failed to undermine that evidence, Wheetley had probable cause to search Harris's truck.  Pp. 5–11.

 (a) In testing whether an officer has probable cause to conduct a search, all that is required is the kind of "fair probability" on which "reasonable and prudent [people] act."  *Illinois* v. *Gates*, 462 U. S. 213, 235.  To evaluate whether the State has met this practical and

common-sensical standard, this Court has consistently looked to the totality of the circumstances and rejected rigid rules, bright-line tests, and mechanistic inquiries. *Ibid.*

The Florida Supreme Court flouted this established approach by creating a strict evidentiary checklist to assess a drug-detection dog's reliability. Requiring the State to introduce comprehensive documentation of the dog's prior hits and misses in the field, and holding that absent field records will preclude a finding of probable cause no matter how much other proof the State offers, is the antithesis of a totality-of-the-circumstances approach. This is made worse by the State Supreme Court's treatment of field-performance records as the evidentiary gold standard when, in fact, such data may not capture a dog's false negatives or may markedly overstate a dog's false positives. Such inaccuracies do not taint records of a dog's performance in standard training and certification settings, making that performance a better measure of a dog's reliability. Field records may sometimes be relevant, but the court should evaluate all the evidence, and should not prescribe an inflexible set of requirements.

Under the correct approach, a probable-cause hearing focusing on a dog's alert should proceed much like any other, with the court allowing the parties to make their best case and evaluating the totality of the circumstances. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, the court should find probable cause. But a defendant must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant may contest training or testing standards as flawed or too lax, or raise an issue regarding the particular alert. The court should then consider all the evidence and apply the usual test for probable cause—whether all the facts surrounding the alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. Pp. 5–9.

(b) The record in this case amply supported the trial court's determination that Aldo's alert gave Wheetley probable cause to search the truck. The State introduced substantial evidence of Aldo's training and his proficiency in finding drugs. Harris declined to challenge any aspect of that training or testing in the trial court, and the Court does not consider such arguments when they are presented for this first time in this Court. Harris principally relied below on Wheetley's failure to find any substance that Aldo was trained to detect. That infers too much from the failure of a particular alert to lead to drugs, and did not rebut the State's evidence from recent training and test-

Syllabus

ing.  Pp. 9–11.

71 So. 3d 756, reversed.

KAGAN, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–817

FLORIDA, PETITIONER *v.* CLAYTON HARRIS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[February 19, 2013]

JUSTICE KAGAN delivered the opinion of the Court.

In this case, we consider how a court should determine if the "alert" of a drug-detection dog during a traffic stop provides probable cause to search a vehicle. The Florida Supreme Court held that the State must in every case present an exhaustive set of records, including a log of the dog's performance in the field, to establish the dog's reliability. See 71 So. 3d 756, 775 (2011). We think that demand inconsistent with the "flexible, common-sense standard" of probable cause. *Illinois* v. *Gates*, 462 U. S. 213, 239 (1983).

I

William Wheetley is a K–9 Officer in the Liberty County, Florida Sheriff's Office. On June 24, 2006, he was on a routine patrol with Aldo, a German shepherd trained to detect certain narcotics (methamphetamine, marijuana, cocaine, heroin, and ecstasy). Wheetley pulled over respondent Clayton Harris's truck because it had an expired license plate. On approaching the driver's-side door, Wheetley saw that Harris was "visibly nervous," unable to sit still, shaking, and breathing rapidly. Wheetley also noticed an open can of beer in the truck's cup holder. App.

62. Wheetley asked Harris for consent to search the truck, but Harris refused. At that point, Wheetley retrieved Aldo from the patrol car and walked him around Harris's truck for a "free air sniff." *Id.,* at 63. Aldo alerted at the driver's-side door handle—signaling, through a distinctive set of behaviors, that he smelled drugs there.

Wheetley concluded, based principally on Aldo's alert, that he had probable cause to search the truck. His search did not turn up any of the drugs Aldo was trained to detect. But it did reveal 200 loose pseudoephedrine pills, 8,000 matches, a bottle of hydrochloric acid, two containers of antifreeze, and a coffee filter full of iodine crystals— all ingredients for making methamphetamine. Wheetley accordingly arrested Harris, who admitted after proper *Miranda* warnings that he routinely "cooked" methamphetamine at his house and could not go "more than a few days without using" it. *Id.,* at 68. The State charged Harris with possessing pseudoephedrine for use in manufacturing methamphetamine.

While out on bail, Harris had another run-in with Wheetley and Aldo. This time, Wheetley pulled Harris over for a broken brake light. Aldo again sniffed the truck's exterior, and again alerted at the driver's-side door handle. Wheetley once more searched the truck, but on this occasion discovered nothing of interest.

Harris moved to suppress the evidence found in his truck on the ground that Aldo's alert had not given Wheetley probable cause for a search. At the hearing on that motion, Wheetley testified about both his and Aldo's training in drug detection. See *id.,* at 52–82. In 2004, Wheetley (and a different dog) completed a 160-hour course in narcotics detection offered by the Dothan, Alabama Police Department, while Aldo (and a different handler) completed a similar, 120-hour course given by the Apopka, Florida Police Department. That same year, Aldo received a one-year certification from Drug Beat, a private company that

specializes in testing and certifying K–9 dogs. Wheetley and Aldo teamed up in 2005 and went through another, 40-hour refresher course in Dothan together. They also did four hours of training exercises each week to maintain their skills. Wheetley would hide drugs in certain vehicles or buildings while leaving others "blank" to determine whether Aldo alerted at the right places. *Id.,* at 57. According to Wheetley, Aldo's performance in those exercises was "really good." *Id.,* at 60. The State introduced "Monthly Canine Detection Training Logs" consistent with that testimony: They showed that Aldo always found hidden drugs and that he performed "satisfactorily" (the higher of two possible assessments) on each day of training. *Id.,* at 109–116.

On cross-examination, Harris's attorney chose not to contest the quality of Aldo's or Wheetley's training. She focused instead on Aldo's certification and his performance in the field, particularly the two stops of Harris's truck. Wheetley conceded that the certification (which, he noted, Florida law did not require) had expired the year before he pulled Harris over. See *id.,* at 70–71. Wheetley also acknowledged that he did not keep complete records of Aldo's performance in traffic stops or other field work; instead, he maintained records only of alerts resulting in arrests. See *id.,* at 71–72, 74. But Wheetley defended Aldo's two alerts to Harris's seemingly narcotics-free truck: According to Wheetley, Harris probably transferred the odor of methamphetamine to the door handle, and Aldo responded to that "residual odor." *Id.,* at 80.

The trial court concluded that Wheetley had probable cause to search Harris's truck and so denied the motion to suppress. Harris then entered a no-contest plea while reserving the right to appeal the trial court's ruling. An intermediate state court summarily affirmed. See 989 So. 2d 1214, 1215 (2008) (*per curiam*).

The Florida Supreme Court reversed, holding that

Wheetley lacked probable cause to search Harris's vehicle under the Fourth Amendment. "[W]hen a dog alerts," the court wrote, "the fact that the dog has been trained and certified is simply not enough to establish probable cause." 71 So. 3d, at 767. To demonstrate a dog's reliability, the State needed to produce a wider array of evidence:

> "[T]he State must present . . . the dog's training and certification records, an explanation of the meaning of the particular training and certification, field performance records (including any unverified alerts), and evidence concerning the experience and training of the officer handling the dog, as well as any other objective evidence known to the officer about the dog's reliability." *Id.,* at 775.

The court particularly stressed the need for "evidence of the dog's performance history," including records showing "how often the dog has alerted in the field without illegal contraband having been found." *Id.,* at 769. That data, the court stated, could help to expose such problems as a handler's tendency (conscious or not) to "cue [a] dog to alert" and "a dog's inability to distinguish between residual odors and actual drugs." *Id.,* at 769, 774. Accordingly, an officer like Wheetley who did not keep full records of his dog's field performance could never have the requisite cause to think "that the dog is a reliable indicator of drugs." *Id.,* at 773.

Judge Canady dissented, maintaining that the majority's "elaborate and inflexible evidentiary requirements" went beyond the demands of probable cause. *Id.,* at 775. He would have affirmed the trial court's ruling on the strength of Aldo's training history and Harris's "fail[ure] to present any evidence challenging" it. *Id.,* at 776.

We granted certiorari, 566 U. S. ___ (2012), and now reverse.

## II

A police officer has probable cause to conduct a search when "the facts available to [him] would 'warrant a [person] of reasonable caution in the belief'" that contraband or evidence of a crime is present. *Texas* v. *Brown*, 460 U. S. 730, 742 (1983) (plurality opinion) (quoting *Carroll* v. *United States*, 267 U. S. 132, 162 (1925)); see *Safford Unified School Dist. #1* v. *Redding*, 557 U. S. 364, 370–371 (2009). The test for probable cause is not reducible to "precise definition or quantification." *Maryland* v. *Pringle*, 540 U. S. 366, 371 (2003). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." *Gates*, 462 U. S., at 235. All we have required is the kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act." *Id.,* at 238, 231 (internal quotation marks omitted).

In evaluating whether the State has met this practical and common-sensical standard, we have consistently looked to the totality of the circumstances. See, *e.g., Pringle*, 540 U. S., at 371; *Gates*, 462 U. S., at 232; *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949). We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach. In *Gates*, for example, we abandoned our old test for assessing the reliability of informants' tips because it had devolved into a "complex superstructure of evidentiary and analytical rules," any one of which, if not complied with, would derail a finding of probable cause. 462 U. S., at 235. We lamented the development of a list of "inflexible, independent requirements applicable in every case." *Id.,* at 230, n. 6. Probable cause, we emphasized, is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.,* at 232.

The Florida Supreme Court flouted this established

approach to determining probable cause. To assess the reliability of a drug-detection dog, the court created a strict evidentiary checklist, whose every item the State must tick off.[1] Most prominently, an alert cannot establish probable cause under the Florida court's decision unless the State introduces comprehensive documentation of the dog's prior "hits" and "misses" in the field. (One wonders how the court would apply its test to a rookie dog.) No matter how much other proof the State offers of the dog's reliability, the absent field performance records will preclude a finding of probable cause. That is the antithesis of a totality-of-the-circumstances analysis. It is, indeed, the very thing we criticized in *Gates* when we overhauled our method for assessing the trustworthiness of an informant's tip. A gap as to any one matter, we explained, should not sink the State's case; rather, that "deficiency . . . may be compensated for, in determining the overall reliability of a tip, by a strong showing as to . . . other indicia of reliability." *Id.,* at 233. So too here, a finding of a drug-detection dog's reliability cannot depend on the State's satisfaction of multiple, independent evidentiary requirements. No more for dogs than for human informants is such an inflexible checklist the way to prove reliability, and thus establish probable cause.

Making matters worse, the decision below treats records of a dog's field performance as the gold standard in evi-

_____

[1] By the time of oral argument in this case, even Harris declined to defend the idea that the Fourth Amendment compels the State to produce each item of evidence the Florida Supreme Court enumerated. See Tr. of Oral Arg. 29–30 ("I don't believe the Constitution requires [that list]"). Harris instead argued that the court's decision, although "look[ing] rather didactic," in fact did not impose any such requirement. *Id.,* at 29; see *id.,* at 31 ("[I]t's not a specific recipe that can't be deviated from"). But in reading the decision below as establishing a mandatory checklist, we do no more than take the court at its (oft-repeated) word. See, *e.g.,* 71 So. 3d 756, 758, 759, 771, 775 (Fla. 2011) (holding that the State "must" present the itemized evidence).

dence, when in most cases they have relatively limited
import. Errors may abound in such records. If a dog
on patrol fails to alert to a car containing drugs, the mis-
take usually will go undetected because the officer will not
initiate a search. Field data thus may not capture a dog's
false negatives. Conversely (and more relevant here), if
the dog alerts to a car in which the officer finds no narcot-
ics, the dog may not have made a mistake at all. The dog
may have detected substances that were too well hidden or
present in quantities too small for the officer to locate. Or
the dog may have smelled the residual odor of drugs pre-
viously in the vehicle or on the driver's person.[2] Field data
thus may markedly overstate a dog's real false positives.
By contrast, those inaccuracies—in either direction—do
not taint records of a dog's performance in standard train-
ing and certification settings. There, the designers of an
assessment know where drugs are hidden and where they
are not—and so where a dog should alert and where he

_____

[2] See U. S. Dept. of Army, Military Working Dog Program 30 (Pam-
phlet 190–12, 1993) ("The odor of a substance may be present in enough
concentration to cause the dog to respond even after the substance has
been removed. Therefore, when a detector dog responds and no drug
or explosive is found, do not assume the dog has made an error");
S. Bryson, Police Dog Tactics 257 (2d ed. 2000) ("Four skiers toke up in
the parking lot before going up the mountain. Five minutes later a
narcotic detector dog alerts to the car. There is no dope inside. How-
ever, the dog has performed correctly"). The Florida Supreme Court
treated a dog's response to residual odor as an error, referring to the
"inability to distinguish between [such] odors and actual drugs" as a
"facto[r] that call[s] into question Aldo's reliability." 71 So. 3d, at 773–
774; see *supra,* at 4. But that statement reflects a misunderstanding.
A detection dog recognizes an odor, not a drug, and should alert when-
ever the scent is present, even if the substance is gone (just as a police
officer's much inferior nose detects the odor of marijuana for some time
after a joint has been smoked). In the usual case, the mere chance that
the substance might no longer be at the location does not matter; a
well-trained dog's alert establishes a fair probability—all that is re-
quired for probable cause—that either drugs or evidence of a drug
crime (like the precursor chemicals in Harris's truck) will be found.

should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.[3]

For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged

————————

[3] See K. Furton, J. Greb, & H. Holness, Florida Int'l Univ., The Scientific Working Group on Dog and Orthogonal Detector Guidelines 1, 61–62, 66 (2010) (recommending as a "best practice" that a dog's reliability should be assessed based on "the results of certification and proficiency assessments," because in those "procedure[s] you should know whether you have a false positive," unlike in "most operational situations").

at oral argument. See Tr. of Oral Arg. 23–24 ("[T]he defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever weight is appropriate"). And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, as the Florida Supreme Court did, an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

## III

And here, Aldo's did. The record in this case amply supported the trial court's determination that Aldo's alert gave Wheetley probable cause to search Harris's truck.

The State, as earlier described, introduced substantial

evidence of Aldo's training and his proficiency in finding drugs. See *supra,* at 2–3. The State showed that two years before alerting to Harris's truck, Aldo had successfully completed a 120-hour program in narcotics detection, and separately obtained a certification from an independent company. And although the certification expired after a year, the Sheriff's Office required continuing training for Aldo and Wheetley. The two satisfied the requirements of another, 40-hour training program one year prior to the search at issue. And Wheetley worked with Aldo for four hours each week on exercises designed to keep their skills sharp. Wheetley testified, and written records confirmed, that in those settings Aldo always performed at the highest level.

Harris, as also noted above, declined to challenge in the trial court any aspect of Aldo's training. See *supra,* at 3. To be sure, Harris's briefs in *this* Court raise questions about that training's adequacy—for example, whether the programs simulated sufficiently diverse environments and whether they used enough blind testing (in which the handler does not know the location of drugs and so cannot cue the dog). See Brief for Respondent 57–58. Similarly, Harris here queries just how well Aldo performed in controlled testing. See *id.,* at 58. But Harris never voiced those doubts in the trial court, and cannot do so for the first time here. See, *e.g., Rugendorf* v. *United States*, 376 U. S. 528, 534 (1964). As the case came to the trial court, Aldo had successfully completed two recent drug-detection courses and maintained his proficiency through weekly training exercises. Viewed alone, that training record—with or without the prior certification—sufficed to establish Aldo's reliability. See *supra,* at 8–9.

And Harris's cross-examination of Wheetley, which focused on Aldo's field performance, failed to rebut the State's case. Harris principally contended in the trial court that because Wheetley did not find any of the sub-

stances Aldo was trained to detect, Aldo's two alerts must have been false. See Brief for Respondent 1; App. 77–80. But we have already described the hazards of inferring too much from the failure of a dog's alert to lead to drugs, see *supra,* at 7; and here we doubt that Harris's logic does justice to Aldo's skills. Harris cooked and used methamphetamine on a regular basis; so as Wheetley later surmised, Aldo likely responded to odors that Harris had transferred to the driver's-side door handle of his truck. See *supra,* at 3. A well-trained drug-detection dog *should* alert to such odors; his response to them might appear a mistake, but in fact is not. See n. 2, *supra.* And still more fundamentally, we do not evaluate probable cause in hindsight, based on what a search does or does not turn up. See *United States* v. *Di Re*, 332 U. S. 581, 595 (1948). For the reasons already stated, Wheetley had good cause to view Aldo as a reliable detector of drugs. And no special circumstance here gave Wheetley reason to discount Aldo's usual dependability or distrust his response to Harris's truck.

Because training records established Aldo's reliability in detecting drugs and Harris failed to undermine that showing, we agree with the trial court that Wheetley had probable cause to search Harris's truck. We accordingly reverse the judgment of the Florida Supreme Court.

*It is so ordered.*