**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 51539**

| | |
|---|---|
| **STATE OF IDAHO,** ) | |
| ) | |
| **Plaintiff-Respondent,** ) | **Boise, January 2026 Term** |
| ) | |
| **v.** ) | **Opinion Filed: January 29, 2026** |
| ) | |
| **JOSHUA J. BARRITT,** ) | **Melanie Gagnepain, Clerk** |
| ) | |
| **Defendant-Appellant.** ) | |
| ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County. Gene A. Petty, District Judge.

The district court's judgment of conviction is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Kimberly A. Coster argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Mark W. Olson argued.

_____

BRODY, Justice

Joshua J. Barritt challenges the district court's denial of his motion to suppress evidence obtained during a warrantless search of his vehicle after a drug dog alerted on it. He contends the drug dog's alert was not a reliable indicator that there were drugs in his vehicle because the undisputed evidence showed that the drug dog's alerts "in the field" over the previous two weeks resulted in finding drug-related evidence only 43% of the time. Barritt argues that, based on these facts alone, the drug dog's alert did not establish a "fair probability" of finding drugs in his vehicle; thus, the alert did not meet the Fourth Amendment's "common sense" standard for finding probable cause to search. The district court concluded that the drug dog's alert gave probable cause to search Barritt's vehicle because the drug dog had 100% accuracy in detecting drug odor in controlled environments, which the district court reasoned was sufficient to establish the reliability of the alert under the totality of the circumstances. For the reasons expressed below, we agree with the district court's conclusion and affirm the judgment of conviction.

1

## I.     FACTUAL BACKGROUND

In May 2023, Canyon County Sheriff Deputy Stephen Craig stopped Barritt for speeding and improper lane changes without signaling. While Deputy Craig conducted license, registration, and warrant checks, another officer from the Nampa Police Department arrived on the scene to assist. Deputy Craig handed the citation-writing process over to the other officer so he could run his drug dog, Payk, around the vehicle to conduct an open-air sniff on the vehicle. Payk alerted on the exterior of the vehicle, near the driver's door. Based on this positive alert, Deputy Craig conducted a search of the interior of the vehicle and found methamphetamine and drug paraphernalia. The State subsequently charged Barritt with possession of methamphetamine and drug paraphernalia and sought an enhanced sentence because he was a persistent violator under Idaho Code section 19-2514.

Barritt moved to suppress the evidence, asserting the warrantless search of his vehicle violated his Fourth Amendment rights. Prior to the hearing on the motion, Barritt requested discovery regarding Payk's training and field performance records. The district court ordered the State to provide all police reports for the fifteen days prior to Barritt's arrest in which Deputy Craig deployed Payk in the field. The reports revealed that during that period Payk had alerted on vehicles seven times in the field (one of which included the alert on Barritt's vehicle), but the alerts resulted in the recovery of drug evidence or drug contraband only three times. Utilizing this information, Barritt argued at the suppression hearing that because Payk's prior alerts resulted in finding drug evidence or drug contraband only 43% of the time, Payk was not a reliable drug dog and the alert on his vehicle was insufficient to establish probable cause to search.

During the suppression hearing, Deputy Craig testified about his history of working with Payk, Payk's training and certification, and Payk's documented performance under controlled conditions. He testified that he had worked with Payk for four years, during which time he went through the drug dog re-certification process with Payk three times because the certification is valid for fifteen months. He testified that, to keep this certification, Payk had to achieve in a controlled setting a "100 percent find rate with no false alerts." He testified that Payk's certification was current at the time of Barritt's traffic stop and arrest.

Deputy Craig also testified that he kept records of every time Payk was deployed and the outcome of each of those deployments. He explained that it is not considered a "bad alert" even if no drug evidence or contraband is found:

We do roadside interviews, background histories on all the occupants. That's why we document. So even -- in some cases [the occupants of the vehicle are] uncooperative. We still don't consider that a bad alert because we -- again, I can't tell you because I can't communicate to my dog at that level -- what the -- what drug lingered on or how long it's been there or if the person's lying about ever having drugs in the vehicle. So we don't consider it a bad alert.

But most of them are backed up with observations made of the vehicle, odors, smells, things that we notice that are related to drug use, the recent drug history of the occupants or roadside interview where they admit that they are around people that use drugs regularly or their vehicle's used by family members, friends that use drugs.

Deputy Craig acknowledged that drugs are not always found as a result of Payk's alerts and was not surprised to learn that no drugs were found in four out of seven alerts. He emphasized that he did not believe Payk would alert if there was not a drug odor. He then explained how, in each instance where Payk alerted in the fifteen days prior to Barritt's arrest but no drugs were found, there were other indicators that drugs or drug contraband had recently been in the vehicle. Deputy Craig testified that, in one instance where no drugs were found, he himself could physically confirm the odor of marijuana emanating from the vehicle. He testified that in a second instance there were multiple air fresheners masking odors and the driver "had a significant history of marijuana use." In a third case, "the driver indicated the brother who used the car smoke[d] marijuana[.]" Deputy Craig testified that, in the fourth case, he was not able to obtain information regarding the occupants' drug usage through interviews, but "[t]hrough local searches for records[,]" he concluded that "the occupants had a long drug history[.]" Deputy Craig also testified that there were two instances during the fifteen-day period prior to Barritt's arrest where Payk did not alert at all during the deployment.

Following the hearing, the district court denied the motion to suppress from the bench "on the basis that the K-9 [Payk] was reliable in this case." Relying on the United States Supreme Court's analysis in *Florida v. Harris*, 568 U.S. 237, 246 (2013), the district court reasoned that the better indicator of Payk's reliability was his "satisfactory performance in a certification or training program" and his reliability in a controlled setting as opposed to the rate in which his alerts in the field actually resulted in the recovery of drug evidence or contraband from a vehicle. Because Payk had a 100% accuracy rate in detecting drug odors in controlled settings, and because Deputy Craig provided what the district court classified as "a very valid explanation" for each of the instances in which Payk alerted to a drug odor but no drug evidence was found, the district court concluded

that, under the totality of the circumstances, the drug dog's alert provided probable cause to search the vehicle.

Barritt subsequently entered a conditional guilty plea to possession of methamphetamine, preserving his right to appeal from the district court's denial of his motion to suppress. The State agreed to dismiss the paraphernalia charge and the persistent violator enhancement. The district court sentenced Barritt to a unified term of five years, with two years fixed, but suspended the sentence and placed Barritt on probation for five years. Barritt timely appealed.

## II.    STANDARDS OF REVIEW

This Court reviews the denial of a motion to suppress under a bifurcated standard. *State v. Howard*, 169 Idaho 379, 381, 496 P.3d 865, 867 (2021). Under this standard, this Court accepts "the trial court's findings of fact unless they are clearly erroneous but will freely review the trial court's application of constitutional principles to the facts found." *Id.* (quoting *State v. Danney*, 153 Idaho 405, 408, 283 P.3d 722, 725 (2012)).

"[W]hether probable cause exists is a question of law [this Court] review[s] de novo with deference given to the facts found by the trial court." *Id.* at 383, 496 P.3d at 869 (citing *State v. Weber*, 116 Idaho 449, 451–52, 776 P.2d 458, 460–61 (1989)).

## III.    ANALYSIS

Barritt contends the district court erred in denying his motion to suppress. He argues the drug dog's alert was insufficient to establish probable cause because Deputy Craig's rate of finding drug evidence or drug contraband after Payk alerted was only 43% in the field. In his briefing, Barritt maintains that because the record indicates Deputy Craig "knew of Payk's limited reliability in predicting the *presence* of drug contraband," he conducted the search knowing there was a "fair probability" drugs would not be found. (Emphasis in original.) Thus, he contends the search was conducted in violation of the probable cause standard articulated by this Court in *State v. Randall*, 169 Idaho 358, 368, 496 P.3d 844, 854 (2021), which requires a "fair probability that contraband or evidence of a crime will be found in a particular place." As explained below, Barritt's contention relies on a rigid interpretation of evidentiary standards that were rejected by the United States Supreme Court in *Florida v. Harris*, 568 U.S. 237, 244 (2013). Accordingly, we agree with the district court that the drug dog's alert established probable cause to search Barritt's vehicle.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

4

seizures. . . ." U.S. Const. amend. IV. Warrantless searches are presumptively unreasonable and therefore, violative of the Fourth Amendment unless the State demonstrates that the search fell within an exception to the warrant requirement. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995). A warrantless search of a vehicle is reasonable under the automobile exception "when there is probable cause to believe the vehicle contains contraband or evidence of a crime." *State v. Anderson*, 154 Idaho 703, 706, 302 P.3d 328, 331 (2012).

In evaluating whether there is probable cause to justify a search, courts employ a practical, common-sense standard based upon the totality of the circumstances. *Harris*, 568 U.S. at 244. "Probable cause is established when the totality of the circumstances known to the officer at the time of the search would give rise—in the mind of a reasonable person—to a fair probability that contraband or evidence of a crime will be found in a particular place." *Randall*, 169 Idaho at 368, 496 P.3d at 854 (emphasis omitted) (quoting *Anderson*, 154 Idaho at 706, 302 P.3d at 331). "A reliable drug dog's alert on the exterior of a vehicle is sufficient, in and of itself, to establish probable cause for a warrantless search of the interior." *Anderson*, 154 Idaho at 706, 302 P.3d at 331 (citing *State v. Tucker*, 132 Idaho 841, 843, 979 P.2d 1199, 1201 (1999)).

The United States Supreme Court addressed the standard for determining a drug dog's reliability in *Harris*. In *Harris*, a drug dog alerted on the defendant's vehicle. *Id.* at 240. The subsequent search of the vehicle did not reveal anything the drug dog was trained to detect, but it did reveal pseudoephedrine and other ingredients for manufacturing methamphetamine. *Id.* at 240–41. As a result of the search, the defendant was charged with possessing pseudoephedrine for use in manufacturing methamphetamine. *Id.* at 241. Later, while the defendant was out on bail, the same drug dog again alerted on the same defendant's vehicle, but the subsequent search revealed nothing of interest. *Id.* The defendant then moved to suppress the evidence found in his vehicle from the first search, arguing that the drug dog's alert did not establish probable cause. *Id.*

At the hearing on Harris' motion to suppress, the state produced evidence of the drug dog's training and certification, which the defendant did not challenge. *Id.* at 241–42. However, the state did not produce records of the dog's performance in the field because the dog's handling officer did not keep those records; "instead, he maintained records only of alerts resulting in arrests." *Id.* at 242. At the suppression hearing, the handling officer explained that the drug dog alerted on the defendant's vehicle when no drug evidence or drug contraband was found because the defendant "probably transferred the odor of methamphetamine to the door handle, and [the dog] responded

5

to that 'residual odor.' " *Id.* Based on the officer's testimony and the drug dog's training records, the trial court concluded the officer had probable cause to search the vehicle and denied the motion to suppress. *Id.*

The Florida Supreme Court reversed, holding that the dog's training and certification were insufficient to establish probable cause. *Id.* The Florida Supreme Court adopted a standard requiring the state to produce a wider array of evidence to establish reliability, including:

- The dog's training and certification records

- An explanation of the particular training and certification

- Field performance records (including any unverified alerts)

- The dog handler's experience and training with the dog

- Any other evidence known to the dog handler about the dog's reliability

*Id.* at 242–43 (discussing *Harris v. State*, 71 So.3d 756, 775 (Fla. 2011)).

The United States Supreme Court reversed the Florida Supreme Court. *Id.* at 244–50. The Court explained that the Florida Supreme Court had misapplied the "fluid concept" of probable cause to require "a strict evidentiary checklist, whose every item the State must tick off." *Id.* at 244–45. The Supreme Court then held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246. In reaching this holding, the Supreme Court explained that "field data" may not represent an accurate picture of a drug dog's reliability because that data may not capture false negatives and cannot account for the fact that the dog may be sniffing drugs that are in too small of a quantity for the officer to find or hidden on an occupant's person. *Id.* at 245–46. The Supreme Court then concluded that "[t]he better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.* at 246. Summarizing its conclusions, the Court explained:

> In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, as the Florida Supreme Court did, an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common

6

sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

*Id.* at 247–48. Because the training records in *Harris* established the drug dog's reliability and the defendant did not challenge the dog's training, the certification process, or whether the drug dog actually alerted to a drug odor emanating from his vehicle, the Supreme Court agreed with the trial court that the officer had probable cause to search the defendant's vehicle. *Id.* at 250.

Here, Barritt's challenge to Payk's reliability is virtually indistinguishable from the reliability challenge at issue in *Harris*. As in *Harris*, Barritt presented no argument challenging the Payk's certification, his performance in controlled environments, or whether the drug dog actually alerted to a drug odor in the first instance—the specific means for contesting a drug dog's reliability outlined in *Harris*. *Id.* at 247–48. Critically, the Supreme Court in *Harris* did *not* endorse a challenge to a drug dog's reliability on the sole basis of the dog's performance in the *field*. To the contrary, the Supreme Court expressly stated that a dog's performance in the field is of *less* relevance or importance when evaluating the drug dog's reliability:

> Making matters worse, the decision [of the Florida Supreme Court] below treats records of a dog's field performance as the gold standard in evidence, when in most cases they have relatively limited import. Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer too locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where the drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability comes away from the field, in controlled testing environments.

*Id.* at 245–46 (footnote omitted).

The sole basis of Barritt's challenge to Payk's reliability is the drug dog's performance in the field. Because the drug dog's performance in controlled environments was established by his training records demonstrating a 100% find rate with no false alerts, and Barritt did not challenge Payk's training or handling, we agree with the district court's conclusion that Payk's alert on Barritt's vehicle provided probable cause for the subsequent search.

7

Barritt argues that this case is distinguishable from *Harris* because Payk's performance in the field is known in this case whereas the drug dog's field performance in Harris was unknown because the officer kept no records of it. He contends that *Harris* left open the possibility that a drug dog's reliability can be undermined by field data, which he argues is further supported by this Court's holding in *State v. Pendleton*, 172 Idaho 825, 833, 537 P.3d 66, 74 (2023). We disagree.

In *Pendleton*, video evidence of a drug dog's deployment and subsequent alert on a vehicle raised serious questions regarding whether the dog was actually sniffing for drugs at all and whether he had in fact alerted to a drug odor. 172 Idaho at 829–30, 537 P.3d 70–71. The video indicated a reasonable likelihood that the drug dog may have been "conditioned to behave in this way" and going through the motions with his handler just to get a treat, a likelihood verified by expert testimony. *Id.* at 829, 537 P.3d at 70. Accordingly, the district court ordered the State to produce four months of the dog's field performance records, including videos of every sniff, a decision this Court affirmed on appeal. *Id.* at 830, 838, 537 P.3d at 70, 79. We explained that the circumstances surrounding the *particular alert* at issue in that case made the field performance records relevant to the reliability challenge:

> [T]he circumstances surrounding a particular alert may "undermine the case for probable cause." [*Harris*, 568 U.S. at 247.] Here, the district court determined that such circumstances exist where video footage of Edo's alert raised concerns that Edo was not "working" but was potentially reacting to handler bias—whether conscious or unconscious. In short, the district court became concerned over evidence that suggests Edo has been conditioned to alert, creating a Pavlovian response rather than a reliable sniff.

*Id.* at 834, 537 P.3d at 75. Thus, while *Pendleton* did involve field performance records, the issue in that case was not the drug dog's find-rate in the field. Rather, the critical issue for which the field data was relevant was whether the dog was actually alerting to the odor of drugs at all.

Here, Barritt does not challenge Payk's reliability in *detecting drug odors*, nor does he challenge whether Payk actually alerted to an odor emanating from his own vehicle. Rather, the sole basis for Barritt's challenge is Deputy Craig's rate of *finding drug contraband* or *drug evidence* following an alert. This challenge rests on the proposition that probable cause can only be established by what is *actually found* during a search conducted subsequent to an alert. But probable cause is not evaluated in hindsight, "based on what a search does or does not turn up." *Harris*, 568 U.S. at 249 (citation omitted). Moreover, the Supreme Court explicitly rejected this proposition in a footnote to the *Harris* opinion:

The Florida Supreme Court treated a dog's response to residual odor as an error, referring to the "inability to distinguish between [such] odors and actual drugs" as a "facto[r] that call[s] into question's Aldo's reliability." But that statement reflects a misunderstanding. A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime (like the precursor chemicals in Harris's truck) will be found.

*Id.* at 249 n.2. (alterations in original) (internal citation omitted). Accordingly, Barritt's challenge to Payk's reliability as a drug dog necessarily fails.

In concluding Payk's alert on Barritt's vehicle established probable cause for the search, the district court distinguished the detection of drug odors from the recovery of drug evidence:

[J]ust because . . . no drugs are found as a result of a positive alert doesn't mean that either drugs were not there at one time or that the person or anything else in the vehicle doesn't have the odor of drugs on them.

The officer also testified specifically about each of those instances that have been argued and provided good information about why he believed those prior incidences of finding no drugs, even though there was a positive sniff from the dog, didn't prove that the dog was unreliable.

And I agree. The explanation that he had for each of those seems like a very valid explanation about the individuals that were involved. . . .

I don't find that the fact that the dog alerted in those instances that have been presented and no drug were actually found shows that the dog is unreliable. I think more reliable evidence is what's happening in a controlled environment. And though I would also say the fact that 100 percent accuracy is required to be recertified through the State of Idaho shows that K-9 Payk was a reliable drug detection on this day.

The district court's analysis is consistent with the Supreme Court's holding in *Harris*. Because Payk's training and certification established his reliability in detecting drug odors—a fact that Barritt did not challenge—his alert on Barritt's vehicle established probable cause for the search. Accordingly, we affirm the district court's denial of Barritt's motion to suppress.

## IV. CONCLUSION

For the foregoing reasons, we affirm Barritt's judgment of conviction for possession of a controlled substance.

Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.

9