2020 IL App (1st) 171627-U

SIXTH DIVISION
February 21, 2020

No. 1-17-1627

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 4320 |
| | ) | |
| ANGELO PORTER, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant's motion to quash arrest and suppress evidence when officers had reasonable suspicion for a stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and probable cause for a search.

¶ 2    Following a bench trial, defendant Angelo Porter was found guilty of possession of a controlled substance (720 ILCS 570/402(c) (West 2016)) and sentenced to 30 months of probation. On appeal, he contends that the trial court erred when it denied his motion to quash arrest and suppress evidence because the officers lacked the reasonable suspicion required to justify a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and the probable cause necessary to justify a search.

We affirm.

¶ 3                                        I. BACKGROUND

¶ 4    Mr. Porter was charged with possession with intent to deliver more than 1 but less than 15 grams of heroin following his February 16, 2017, arrest. Mr. Porter filed a motion to quash the arrest and suppress the evidence. At the hearing on the motion, Chicago police officer Mary Jo Fahey testified that she and her partner, Officer Davis, were on duty at around 12:25 p.m. on February 16, 2017, when Officer Fahey observed Mr. Porter standing on the sidewalk with another person. When Officer Fahey first observed Mr. Porter, he had "something in his hands." Mr. Porter was also holding money. Officer Fahey observed Mr. Porter look in her direction, turn away, and appear to "stuff*** something up his sleeve," but she could not tell what it was. Officers Fahey and Davis parked to conduct a field interview. The officers began talking to Mr. Porter while still in their vehicle, and then exited. At this point, Mr. Porter was not holding anything.

¶ 5    The officers asked Mr. Porter for his identification and when he could not produce any, they requested his address. They also asked if he had anything in his sleeve. About a minute after Officer Fahey exited her vehicle, Mr. Porter's cell phone rang and continued to ring throughout the encounter. Officer Fahey told Mr. Porter to wait to answer the phone "until we're done." Officer Davis ran Mr. Porter's name and found no warrants for his arrest. At one point, Officer Davis asked Mr. Porter if they could search him and Mr. Porter said yes. She thought that Officer Davis asked Mr. Porter to remove his jacket and Mr. Porter complied. Officer Davis next asked Mr. Porter to open his sleeve, and at that time Officer Davis saw a plastic bag. When asked what the bag was, Mr. Porter answered "drugs." Suspect narcotics were then recovered from Mr. Porter.

¶ 6    During cross-examination, Officer Fahey acknowledged that the video started when she exited the vehicle. Prior to exiting the vehicle, she spoke with Mr. Porter through a window. Mr.

Porter initially stated that he was buying a cat. However, when "the stories started to change," the officers decided to exit their vehicle to further investigate. It was at this point that Officer Fahey turned on her body camera and began to record her interaction with Mr. Porter.

¶ 7     The video was published to the court without objection. The video begins as Officer Fahey exits her vehicle and shows the subsequent conversation between Officer Fahey, Officer Davis, Mr. Porter, and another man.

¶ 8     In the video, Officer Fahey states that Mr. Porter and the other man are being recorded, asks if they want to continue with their "silly story," and asks what they were doing. Mr. Porter states that he has "nothing" in his sleeve as he unzips his coat. Officer Davis tells Mr. Porter that before the officers pulled up, "you guys" were engaged in a hand-to-hand transaction and "you" had the money in your hand. Mr. Porter replies, while gesturing to the other man, that the other man was asking for change for a "ten." Officer Fahey then asks what Mr. Porter put in his sleeve. She also states that although Mr. Porter claimed that he was making change, Mr. Porter previously stated that he was buying a cat. Mr. Porter replies that "he is" and points to a building. Officer Fahey states that she was talking about "you," Mr. Porter, "buying a cat." After Mr. Porter answers no, Officer Fahey asks what he was putting in his sleeve. Mr. Porter denies putting anything up his sleeve.

¶ 9     Officer Fahey next asks whether Mr. Porter has any weapons or identification, and Mr. Porter says no. Mr. Porter's phone begins to ring and Officer Fahey tells him to let it "ring for a minute." She asks why the men were handing each other money and whether they were giving change, buying a cat, or dropping off a cat. She then asks Mr. Porter whether he has a drug background and Mr. Porter answers yes. Officer Fahey explains that what the officers saw "looked like a narcotics transaction" and that is why they stopped. She notes that she had heard three

different "stories" and asks whether the men could understand the officers' "suspicion," and the second man says "yeah." Mr. Porter continues to say that he did not put anything in his sleeve and his phone continues to ring. Officer Fahey tells Mr. Porter to "just wait a second until we're done." Officer Fahey asks the second man why they were exchanging money and says she is not "buying" the story. Officer Fahey next states that this is a "strong narcotic area" and the officers were curious. She then asks whether money is owed, and the second man states that they were making change for $20. At the same time, Officer Davis asks Mr. Porter for his last address.

¶ 10    Officer Fahey next asks Mr. Porter where he lives, and Mr. Porter replies that he is homeless. She again asks Mr. Porter whether he has drugs in his background and whether he ever sold drugs. Mr. Porter answers "a long time ago" to both questions. Officer Fahey then asks Mr. Porter where he gets his money and Mr. Porter answers his family and "chores." Officer Fahey states that there have been complaints about people selling drugs in the area and that people "exchanging something" appears suspicious. She notes that the men were nervous, tried to walk away, and gave the "cat story." Mr. Porter replies that "you can't even exchange money in the street." Officer Fahey replies that it seemed suspicious when Mr. Porter and his companions "peeled off." Officer Davis then asks Mr. Porter whether Mr. Porter has anything in his sleeve and whether Officer Davis can "check." Mr. Porter says "sure."

¶ 11    Officer Davis then enters the officers' vehicle and appears to run a computer check. Mr. Porter's phone continues to ring. Officer Fahey says that Mr. Porter is "blowing up" and "must be the man." Mr. Porter replies that he is holding multiple phones and needs to drop them off for a friend. When Mr. Porter tries to answer, Officer Fahey tells him to "wait until we're done." Officer Davis returns something to the second man and then tells Mr. Porter to remove his jacket and open his sleeve so that Officer Davis can see "skin." Officer Davis then asks "What's that? What's that

plastic bag in there?" Mr. Porter answers "drugs." Officer Fahey says that Mr. Porter was "doing what we thought," and the officers handcuff him.

¶ 12    The State argued that the officers approached Mr. Porter because they thought they "interrupted" a hand-to-hand transaction and spoke to Mr. Porter and his companion for a "short amount of time." The State noted that Mr. Porter stayed and answered the officers' questions and the officers never ordered Mr. Porter to show his sleeve. Rather, the officers asked Mr. Porter and he complied, such that there was no violation of Mr. Porter's fourth amendment rights. The defense replied that the evidence showed that Mr. Porter was seized, noting that Officer Fahey repeatedly told Mr. Porter not to answer the phone and that Mr. Porter was told to "stay still" by the officers. The defense further argued that there was no justification for the seizure when the officers only saw Mr. Porter handing "some money to somebody on the street." The defense concluded that even if the stop was valid, there was no probable cause to search Mr. Porter.

¶ 13    In denying the motion to suppress, the court found Officer Fahey to be credible and noted that the "question" was whether the officers had a reasonable articulable suspicion to stop Mr. Porter or merely a hunch. The court concluded that the officers had a reasonable articulable suspicion when they observed Mr. Porter with money in his hand and he turned his back to them and put something in his sleeve after noticing them. Moreover, when the officers exited the vehicle and heard different stories about what was happening, they engaged in the "essence" of a *Terry* stop, that is, "to find out what's going on." The court concluded that based on "everything," including the video and Officer Fahey's testimony, the officers had probable cause to ask Mr. Porter to remove his coat and to look in his sleeve.

¶ 14    The matter proceeded to a bench trial where the parties stipulated to Officer Fahey's testimony and the videotape. The State then offered a stipulation that the suspect narcotics

recovered from Mr. Porter had a total weight of 1.1 grams and tested positive for heroin. The defense objected to "the admission of any evidence about the drugs *** to preserve our Fourth Amended motions appeals." The trial court overruled the objection. The trial court found Mr. Porter not guilty of possession with intent to deliver more than 1 but less than 15 grams of heroin, but guilty of the lesser-included offense of possession of a controlled substance.

¶ 15    Mr. Porter filed a motion for a new trial. One basis for that motion was that the trial court erred when it denied the motion to quash arrest and suppress evidence. The court denied the motion. Following a hearing, the court sentenced Mr. Porter to 30 months of probation.

¶ 16                                II. JURISDICTION

¶ 17    Mr. Porter was sentenced on June 9, 2017, and timely filed a notice of appeal that same day. This court has jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

¶ 18                                III. ANALYSIS

¶ 19    On appeal, Mr. Porter argues the trial court erred in denying his motion to quash arrest and suppress evidence when the officers lacked the reasonable suspicion necessary to effectuate a *Terry* stop. He argues that the officers had nothing more than a hunch that he was involved in a narcotics transaction. In the alternative, he argues that if the *Terry* stop was justified, the police did not have probable cause for the search. He concludes that the drugs recovered as a result of the search must be suppressed and, because the State cannot prevail on remand without this evidence, that his conviction should be reversed.

¶ 20    We apply a two-part standard of review when considering a trial court's ruling on a motion to suppress evidence. *People v. Timmsen*, 2016 IL 118181, ¶ 11. First, we will uphold the trial

court's factual findings unless they are against the manifest weight of the evidence. *Id*. A finding of fact is against the manifest weight of the evidence where an opposite conclusion is clearly evident. *People v. Miles*, 343 Ill. App. 3d 1026, 1030 (2003). Second, we review *de novo* the court's legal conclusion regarding whether suppression is warranted. *Timmsen*, 2016 IL 118181, ¶ 11.

¶ 21    "Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31 (citing U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). However, in *Terry*, the United States Supreme Court recognized a limited exception to the warrant requirement. Pursuant to *Terry*, "a police officer may briefly stop a person for temporary questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime." *Thomas*, 198 Ill. 2d at 109. To justify a *Terry* stop, officers must be able to point to specific and articulable facts that, considered with the rational inferences therefrom, make the intrusion reasonable. *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 22    "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and due weight must be given to the reasonable inferences the officer is entitled to draw from the facts in light of his experience." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 19; see also *People v. Williams*, 2016 IL App (1st) 132615, ¶ 44 (a hunch or unparticularized suspicion is not sufficient). When "determining whether the officer had a reasonable suspicion, a court considers the totality of the circumstances known to the officer" (*In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 97), and views those facts "from the perspective of a reasonable officer at the time of the stop" (*People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14).

"The officer does not have to personally observe the commission of a crime to make a stop; rather, [the officer] is required to possess enough facts which lead him to 'reasonably conclude in light of experience that criminal activity may be afoot,' and that this particular individual may be involved." *Edgar C.*, 2014 IL App (1st) 141703, ¶ 99 (quoting *Terry*, 392 U.S. at 30).

¶ 23     Based on the totality of the circumstances in this case, we find the *Terry* stop was valid when, after observing what they believed was a hand-to-hand transaction, officers approached Mr. Porter and his companion and asked questions in order to determine what had transpired. We also agree with the trial court that the inquiry the officers made during the *Terry* stop gave them probable cause for the search.

¶ 24     The record reveals, through Officer Fahey's testimony and the video, that the officers stopped their vehicle after observing Mr. Porter on the sidewalk with another person. Officer Fahey testified that when she first saw Mr. Porter on the street, he was holding money and something else in his hands. Mr. Porter looked in her direction, turned away, and appeared to stuff something in his sleeve. At this point, Mr. Porter and his companions all "peeled" off, an action which Officer Fahey characterized as suspicious. The officers then stopped Mr. Porter to conduct a field interview. Officer Fahey also stated in the video that the officers were suspicious when they saw what looked like a narcotics transaction, that is, an exchange of money on the street, in an area of narcotics activity.

¶ 25     In light of the officers' experience and the actions they observed, we find they had a reasonable articulable suspicion that criminal activity might be afoot. Two men were exchanging money and something else, and after Mr. Porter looked in the officers' direction, he turned away and appeared to push something into his sleeve. See *Edgar C.*, 2014 IL App (1st) 141703, ¶ 99. Officer Fahey testified to specific facts, which considered with the rational inferences based upon

those facts, justified the initial stop under *Terry*. *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 26    Mr. Porter contends that even if the initial stop was warranted under *Terry*, the officers never developed probable cause to search him. Mr. Porter posits that the mere fact that officers observed an alleged hand-to-hand transaction coupled with Mr. Porter putting something in his sleeve does not constitute probable cause for a search. See *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 17 ("probable cause is not established by a single hand-to-hand transaction involving an unidentified object together with a few furtive hand movements"). He also argues that the officers did not learn any additional information during the *Terry* stop which would create probable cause.

¶ 27    "A warrantless search is permissible if there is probable cause to believe that a crime has been committed and that a search of a particular place or thing will disclose evidence or fruits of the offense." *People v. Jones*, 214 Ill. App. 3d 256, 258 (1991); see also *Florida v. Harris*, 568 U.S. 237, 243 (2013) (a police officer has probable cause to search when the facts available to him would warrant a person of reasonable caution to believe that contraband or evidence of a crime is present). The test for probable cause cannot be reduced to a precise definition or quantification. *Harris*, 568 U.S. at 243. Indeed, probable cause is a fluid concept that depends not on a neat set of legal rules, but rather on an assessment of probabilities in a particular factual context. *Id.* at 244.

¶ 28    What constitutes probable cause for searches and seizures is governed by the totality of the facts and circumstances in each case (*People v. Hanna*, 42 Ill. 2d 323, 328-29 (1969)), and is determined from the standpoint of the arresting officer with his or her skill and knowledge, rather than that of an average citizen under the same circumstances (*Jones*, 214 Ill. App. 3d at 258).

¶ 29    In this case, when we examine the totality of the circumstances known to Officers Fahey and Davis at the time of the search, we conclude that there was probable cause for that search. To briefly restate the facts, the officers stopped their vehicle after Officer Fahey observed Mr. Porter

on the street holding money and something else, and after Mr. Porter looked in her direction, Officer Fahey observed him turn away and put something in his coat sleeve. During a subsequent conversation, Mr. Porter and his companion initially indicated that the exchange of money was related to a cat although no cat appeared to be present. The men next stated that they were making change, either for $10 or $20. Throughout the encounter, Officer Fahey repeatedly asked Mr. Porter what he put in his sleeve and Mr. Porter repeatedly denied that he put anything in his sleeve. Moreover, Mr. Porter was carrying multiple cell phones and could not produce any identification.

¶ 30 Here, the officers' initial observations of Mr. Porter's conduct led them to reasonably suspect that Mr. Porter was engaged in a narcotics transaction. This suspicion intensified when, after seeing the officers, Mr. Porter turned away and placed an object in his sleeve. During the subsequent conversation, Mr. Porter denied having something in this sleeve, and offered several inconsistent explanations for his actions. Based on Mr. Porter's responses and the totality of the circumstances, the officers could reasonably conclude that Mr. Porter was concealing contraband in his sleeve, which provided probable cause to search Mr. Porter. See *People v. Love*, 199 Ill. 2d 269, 280-81 (2002) (an officer's reasonable suspicion rose to the level of probable cause when, after seeing a man trade currency to a person on a bicycle in exchange for something from the defendant's mouth, the officer approached the defendant to ask her name and received a "garbled response," leading to the conclusion that she was concealing contraband in her mouth). Therefore, we conclude that the trial court did not err when it denied Mr. Porter's motion to quash arrest and suppress evidence. See *Timmsen*, 2016 IL 118181, ¶ 11.

¶ 31 IV. CONCLUSION

¶ 32 For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 33 Affirmed.