Filed 2/26/21  In re M.R. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.R., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>A.H. et al.,<br><br>Defendants and Respondents. | F080694<br><br>(Super. Ct. No. 19CEJ300085-1)<br><br>**OPINION** |

APPEAL from orders of the Superior Court of Fresno County.  John F. Vogt, Judge.

Daniel C. Cederborg, County Counsel, and Kevin A. Stimmel, Deputy County Counsel, for Plaintiff and Appellant.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Respondent, A.H.

Gino de Solenni, under appointment by the Court of Appeal, for Defendant and Respondent, M.R.

-ooOoo-

The Fresno County Department of Social Services (department) filed a juvenile dependency petition on behalf of then one-month-old M.R., who had suffered multiple

fractures for which his parents, A.H. (mother) and M.R. (father) (collectively, the parents), had no explanation, alleging he came within the juvenile court's jurisdiction under Welfare and Institutions Code[1] section 300, subdivisions (a), (b), (e), and (i). The juvenile court found the subdivision (b) allegations true but found the department had not proven the section 300, subdivision (a), (e), or (i) allegations. Both parents were ordered to receive reunification services.

The department appeals the juvenile court's dispositional order, contending the court erred by finding that the section 300, subdivision (e) allegation had not been proven and, accordingly, that the section 361.5, subdivision (b)(5) bypass provision, which requires a finding the child came within the court's jurisdiction under section 300, subdivision (e), did not apply. We affirm.

## **FACTUAL AND PROCEDURAL BACKGROUND**[2]

In February 2019, the parents took M.R. to his pediatrician because he was being fussy and not drinking as much as usual. M.R.'s pediatrician had M.R. transferred to the hospital. M.R. was diagnosed with bilateral fluid in his chest and was admitted to the hospital for one week. Approximately two to three weeks later, the parents took M.R. to the hospital again because he had exhibited similar symptoms. X-rays and a "CAT" scan revealed that M.R. had multiple rib fractures on both sides in various stages of healing and multiple leg fractures. The doctor who reviewed the X-rays observed the parents appeared surprised to find out about the fractures. He also observed that mother had been at the hospital all day and had been appropriate. The parents reported to hospital staff

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] For reasons unknown to us, the department's jurisdiction/disposition report and an addendum report were not included in the record on appeal. On May 29, 2020, the department requested we take judicial notice of these reports. On June 10, 2020, this court deferred ruling on the department's motion pending consideration of the appeal on its merits. The parents did not object to the court's taking judicial notice of the documents. We hereby grant the department's request.

they sometimes hold M.R. up by his armpits but otherwise had no explanation for how he sustained the injuries. Doctors at the hospital opined that M.R.'s injuries were nonaccidental unless a cause could be demonstrated by a major bone structural disease.

A referral was made to the department, who in turn contacted the police department. The investigating social worker and the responding police officer interviewed the parents individually at the hospital. Each parent told the social worker and police officer they did not know what happened to M.R. and that they and M.R. are the only three people in their home, with the exception of a short period of time when the maternal grandmother visited to help with M.R. Mother worked full time, and father would watch M.R. while mother worked.

M.R.'s parathyroid hormone (PTH) level was elevated at 90.7, with a normal range of 14-64, and his vitamin D level was 18, with insufficiency being defined as 30 or lower. It was reported by hospital staff M.R. possibly had rickets (softening or weakening of bones) or osteogenesis imperfecta (brittle bone disease).

The department filed a first amended petition on behalf of M.R., alleging he came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (severe physical abuse on a child under five), and (i) (cruelty). The allegations under section 300, subdivision (b) alleged that M.R. had suffered serious physical harm due to the parents' failure to provide adequate care, supervision, and protection for M.R. The allegations under section 300, subdivisions (a), (e), and (i) included allegations that both parents inflicted M.R.'s injuries.

M.R. was ordered detained from the parents. Subsequently, one of M.R.'s lab results came back with an "unusual organism," and he was transferred to the University of California San Francisco (UCSF) Benioff Children's Hospital for further testing. Upon discharge from the hospital a few days later, M.R. was placed with his maternal great-grandmother. A follow-up appointment indicated most of M.R.'s fractures had healed.

In the department's combined jurisdiction/disposition report, it was reported the parents had no criminal or prior child welfare history. The department recommended the allegations in the first amended petition be found true and that mother and father be denied reunification services pursuant to section 361.5, subdivision (b)(5) and (b)(6).[3]

The parents requested a contested hearing. Father's statement of contested issues indicated his position was M.R.'s fractures were sustained due to a bone condition unknown to the parents at the time the fractures occurred. In mother's statement of contested issues, she argued M.R.'s low vitamin D levels coupled with the stages of healing of the fractures, indicated the injuries appeared to be from a vitamin deficiency or genetic defect that had not yet been discovered.

After multiple continuances in order to allow time for M.R.'s test results to be completed and because mother received new counsel, a combined jurisdiction/disposition hearing was held over three days, October 8 through 10, 2019.

The department called Emily Spieren, M.D., UCSF neonatalist, who was certified as an expert in neonatology and pediatrics. Dr. Spieren was the attending neonatologist while M.R. was in the intensive care nursery at UCSF. Dr. Spieren testified M.R.'s leg fractures were "bucket handle" fractures commonly caused by tension along the long axis of the bone like pulling with force or when a child is shaken. In her opinion, M.R.'s injuries were caused by nonaccidental trauma. The mechanism for the types of injuries

---

[3] Section 361.5, subdivision (b) provides in pertinent part that: "Reunification services need not be provided to a parent … when the court finds, by clear and convincing evidence[:] [¶] … [¶]

"(5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent[; or]

"(6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child … by a parent … and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(5) & (b)(6).)

M.R. received were not the type that occur in an accident like a fall, and no traumatic event or accident was reported. Further, there was no report of a family history with higher incidence of fractures, and the fractures were in different stages of healing. Dr. Spieren consulted with endocrinology, infectious disease, neurology, and gastroenterology, and none of these departments found a cause for M.R.'s fractures. None of the consultants Dr. Spieren talked to thought M.R.'s vitamin D level was low enough to lead to increased risk of fractures.

On cross-examination, Dr. Spieren testified she was not an expert in determining whether an injury was caused by accidental or nonaccidental trauma, and she did not speak with the child abuse expert who evaluated the case directly. Dr. Spieren did not have specialized training in diagnosing metabolic bone disease. Dr. Spieren testified that brittle bones can be caused by osteogenesis imperfecta or nutritional or genetic rickets, but Dr. Spieren stated she was not an expert in that field and does not know of other disorders that could cause brittle bones.

Dr. Spieren testified that M.R. did not have damage to his internal organs, external bruising, or any outward signs of trauma. There were no hemorrhages or hematomas found in M.R.'s brain and no hemorrhages found in M.R.'s eyes. Dr. Spieren was not aware of the frequency of bleeding in the eyes or brain in infants who are shaken, and although the fractures sustained by M.R. are seen in infants who are shaken, they are also seen in infants who are not shaken.

Dr. Spieren testified that M.R.'s X-rays did not show he had decreased bone density, but she was not aware of any specific bone density test that was done. Dr. Spieren also testified she would be concerned about a child who had fractures and an abnormal PTH level, as PTH is important for bone mineralization and formation. Though M.R.'s PTH was high at one point, it was normal when Dr. Spieren had him tested again.

5.

The department called Joseph Shen, M.D., who was certified as an expert in pediatric genetics. Dr. Shen testified he had conducted genetic testing on M.R. on four genes known to cause osteogenesis imperfecta, a bone fragility syndrome. M.R. tested positive for an inconclusive "change" in one of the genes, but Dr. Shen concluded it was not clinically meaningful and did not tend to show it was a cause for osteogenesis imperfecta because there was no family history of bone fragility reported. Based on this testing, Dr. Shen concluded it did not appear that M.R. had osteogenesis imperfecta. Though further testing was requested, Dr. Shen chose to see how M.R. did with his care provider before ordering. That no further fractures were reported while M.R. was in the care of his care provider supported Dr. Shen's opinion that M.R. did not have a bone fragility syndrome.

Dr. Shen admitted there were numerous bone fragility syndromes, but he only tested for osteogenesis imperfecta. The current testing can confirm osteogenesis imperfecta in 70 to 90 percent of cases, but a clinical diagnosis could be made where the patient continues to receive fractures.

Mother called maternal great-grandmother and care provider of M.R., Eloise H. Eloise testified she was the third-party supervisor of visits between the parents and M.R. She had never seen mother squeeze or play rough with M.R. and had no concerns with visits. Eloise did not know father very well and did not get along very well with him when she first met him. Eloise was skeptical of father being able to take care of M.R. because she did not know whether he knew how to care for M.R. or change a diaper. Eloise had since gotten to know father better and she has seen him mature and make more of a fatherly connection with M.R. Father appeared very happy and excited around M.R. and Eloise had never seen father get frustrated with M.R. When asked if either parent would intentionally hurt M.R., Eloise responded, "No, with a capital N and a capital O." Though doctors had told her the injuries were likely nonaccidental, Eloise believed the injuries were accidental and caused by the parents not knowing how to handle the baby;

6.

her opinion was based on her own experience and not on anything a doctor had told her. M.R. had not had any new fractures since being placed with her, but his last X-ray was in March or April 2019.

Mother called maternal grandmother, Nicole F. Nicole testified she visited the family from Sacramento every other week after M.R. was born. She generally saw nothing concerning about how the parents handled M.R., but on one occasion, she saw father pick M.R. up by his armpits and walk around with him in that position. That evening, M.R.'s breathing became labored so she suggested the parents take him to the hospital. Nicole testified M.R. is always happy when he sees mother. When asked if she thought father could have been capable of hurting M.R., she responded, "I don't know." She said father may have unintentionally hurt M.R. by being too rough. Nicole testified she thinks father loves M.R. and was excited to have a son.

Mother testified on her own behalf. She testified she never saw father get frustrated with M.R. and that father and M.R. had a good relationship. She said she was not currently in a relationship with father because M.R.'s removal "pretty much killed everything." She never squeezed M.R. or saw father squeeze him. When asked what happened to M.R., mother responded, "I don't know." When asked if she thought father did something, she said, "I really don't know what happened to my son." She went on to say, "I think it's something medical, but I don't know." She had never seen father lose his temper with any child or do anything that seemed to hurt M.R. Both parents were completely shocked when they were told M.R. had fractures.

After hearing the evidence presented, the court stated it wanted to "go back through this documentation in more detail. The specific types of questions asked and the cross-examination of … Dr. Spieren, I think compel me to take a closer look at the details involved here." The court ordered briefing from the parties on what they felt were the pertinent factual issues of the case.

In its briefing on section 300, subdivision (e), the department argued the case was "identical to *In re E.H.* (2003) 108 Cal.App.4th 659, 667–670 [(*E.H.*)]," and because both parents maintained they did not cause the injuries and were the only caretakers of M.R., the court should sustain the section 300, subdivision (e) allegations despite the "fact that the injuries were not visible and there is no identified perpetrator."

In M.R.'s briefing, M.R.'s counsel argued the court should follow the department's recommendations. As to section 300, subdivision (e), M.R., through counsel, argued the court did not need to identify a perpetrator, citing *E.H.*, and that section 300, subdivision (e) did not require the parents' " 'actual or constructive knowledge' " of the abuse, citing *In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1729.

As to section 300, subdivision (e), father argued a reasonable conclusion could not be drawn from the evidence "that the parents caused the injuries or *reasonably* should have known that [M.R.] was being physically harmed by someone in the house." Father argued there was no evidence produced that the specific types of fractures suffered by M.R. were abuse and that Drs. Spieren and Shen could not rule out nutritional rickets nor osteogenesis imperfecta.

At a continued hearing, the court found the section 300, subdivision (b) allegations true and that the department had not proven the section 300, subdivision (a), (e), or (i) allegations. The court accordingly found the bypass provisions under section 361.5, subdivision (b)(5) and (b)(6) did not apply. The court went on to explain that even if the court found the bypass provisions did apply, the court would have found that ordering reunification services for the parents was in M.R.'s best interest. The court noted that M.R.'s maternal great-grandmother was in her 70's and that the parents, particularly mother, had demonstrated bonding with M.R.

The court ordered the parents to participate in parenting classes, a domestic violence evaluation, a substance abuse assessment, a mental health evaluation, random drug testing, and a risk assessment.

**DISCUSSION**

## I.     Mootness

The parents argue we need not address the merits of the department's appeal because the issues the department raises are moot.[4]

"An appellate court will not review questions which are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way. [Citation.]  An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief.  [Citations.]  On a case-by-case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054–1055.)

As to the department's appeal of the court's jurisdictional findings, the parents argue the issue is moot because the juvenile court took jurisdiction over M.R. under section 300, subdivision (b) (an order which is not a subject of this or any other appeal), and M.R. would remain a dependent regardless of any decision we make regarding the section 300, subdivision (e) findings.

As to the department's appeal of the juvenile court's grant of reunification services, the parents argue the issue is moot because, while the present appeal was

---

[4]     On August 28, 2020, prior to filing respondents' briefs, both parents filed motions to dismiss the appeal as moot.  On September 21, 2020, this court deferred ruling on these motions pending consideration of the appeal on its merits.  The parents subsequently addressed the mootness issue in their briefs.  We hereby deny the parents' motions and address the parents' arguments on mootness within this opinion.

9.

pending, the parents have completed reunification services, and M.R. has been placed with them on family maintenance services at the recommendation of the department.[5]

The department disagrees that its challenge to the court's jurisdictional findings is moot. The department argues this court should consider the merits of its appeal because the outcome could affect whether the parents would be subject to the bypass provision in section 361.5, subdivision (b)(3) in the event M.R. was subject to a future dependency proceeding and removed from the parents due to abuse. Section 361.5, subdivision (b)(3) provides that reunification services need not be provided to a parent when "the child or a sibling of the child has been previously adjudicated a dependent pursuant to any subdivision of Section 300 as a result of physical or sexual abuse, that following that adjudication the child had been removed from the custody of the child's parent or guardian pursuant to Section 361, that the child has been returned to the custody of the parent or guardian from whom the child had been taken originally, and that the child is being removed pursuant to Section 361, due to additional physical or sexual abuse."

Here, if we were not to address the merits of the department's jurisdictional appeal, and if M.R. were to be removed in the future from the parents due to physical abuse, it does not appear any bypass provision would apply, and the parents would likely receive reunification services by default. The purpose of bypass provisions is that they "exempt[] from reunification services 'those parents who are unlikely to benefit'

---

[5] On August 28, 2020, mother filed a motion requesting we take judicial notice of three documents filed in the underlying matter: (1) the May 20, 2020 minute order for the combined six- and 12-month status review hearing indicating the court continued both parents' family reunification services; (2) the department's status review report, dated July 31, 2020, wherein the department recommended family maintenance services be ordered; and (3) the August 12, 2020 minute order for the 18-month status review hearing indicating the court terminated family reunification services and ordered family maintenance services. The department has filed no objection to our taking judicial notice of these documents. On September 21, 2020, this court deferred ruling on this request pending consideration of the appeal on its merits. We hereby grant mother's motion for judicial notice.

10.

[citation] from such services or for whom reunification efforts are likely to be 'fruitless.' [Citation.] Once the juvenile court concludes reunification efforts should not be made in a particular case, it ' "fast-tracks" ' the dependent minor to permanency planning so that a permanent out-of-home placement can be developed." (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120–1121.) If the challenged finding was erroneous, and M.R. were to be removed in the future due to abuse, M.R.'s interest in permanence and stability could be affected by the inapplicability of the section 361.5, subdivision (b)(3) bypass provision. For these reasons, we will review the department's appeal to the court's jurisdictional findings.

As to the juvenile court's order granting reunification services to the parents, however, we agree with the parents that this court could make no disposition that would have a practical effect on the underlying or future dependency proceedings. The department makes no argument as to why the court's granting of reunification services is not moot in light of the parents receiving and completing reunification services and reunifying with M.R. on family maintenance services. We will not address the court's dispositional finding that the section 361.5, subdivision (b)(5) bypass provision did not apply, as the issue is moot.

## II.    Jurisdiction

### A.    *Section 300, Subdivision (e)*

A child comes within the jurisdiction of the juvenile court under section 300, subdivision (e) when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).) The definition of "severe physical abuse" relevant to this case is "more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness …." (*Ibid.*)

11.

## B. *Allegations*

The allegations under section 300, subdivision (e) in the first amended petition read as follows:

"[e-1]: [M.R.], a one-month-old child, has suffered severe physical abuse by [mother]. On or about March 10, 2019, while in the care and custody of [mother], [M.R.] sustained serious physical injuries and was hospitalized. Such injuries include, but are not limited to, multiple bilateral rib fractures, in addition to fractures to his left femur and on the right and left distal tibia and fibula. According to medical professionals, the injuries appeared to be non-accidental and appear to be in various stages of the healing process. [Mother] has no reasonable explanation as to how [M.R.] sustained his injuries.

"[e-2]: [M.R.] is under the age of five and has suffered severe physical abuse due to negligence by [mother]. On or about March 10, 2019, while [M.R.] was in [the parents'] care, [M.R.] was found to have multiple bilateral rib fractures, in addition to fractures to his left femur and on the right and left distal tibia and fibula, which were all in various stages of healing. The injuries to [M.R.] were caused by [father], and [mother] knew or reasonably should have known that [M.R.] was at risk of physical abuse by [father]; however, she failed to protect [M.R.] from further abuse by [father].

"[e-3]: [M.R.], a one-month-old child, has suffered severe physical abuse by [father]. On or about March 10, 2019, while in the care and custody of [father], [M.R.] sustained serious physical injuries and was hospitalized. Such injuries include, but are not limited to, multiple bilateral rib fractures, in addition to fractures to his left femur and on the right and left distal tibia and fibula. According to medical professionals, the injuries appeared to be non-accidental and appear to be in various stages of the healing process. [Father] has no reasonable explanation as to how [M.R.] sustained his injuries.

"[e-4]: [M.R.] is under the age of five and has suffered severe physical abuse due to negligence by [father]. On or about March 10, 2019, while [M.R.] was in [the parents'] care, [M.R.] was found to have multiple bilateral rib fractures, in addition to fractures to his left femur and on the right and left distal tibia and fibula, which were all in various stages of healing. The injuries to [M.R.] were caused by [mother] and [father] knew or reasonably should have known [M.R.] was at risk of physical abuse by

12.

[mother]; however, he failed to protect [M.R.] from further abuse by [mother]."

## C.      The Court's Ruling

We transcribe the entirety of the court's ruling so the department's points can be placed in context:

"… Let me just state that there is no doubt that [M.R.] has suffered severe and major physical injuries and they happened while in the custody and care of [the parents].

"Now, the parents have consistently denied any knowledge how the minor was or could have been so injured.  And the evidence is that except for a brief period in which the maternal grandmother was present in the household, there were no other adults around the child who could have been responsible for the injuries.

"Now, the evidence and testimony of medical professionals consistently supports findings that the injuries were consistent with nonaccidental trauma.  Investigation and testing for possible genetic or other organic causes for the injuries have not supported such other benign explanation for the injuries.  It's also noted that the minor has suffered no new injuries since being placed with the maternal great grandmother back in March of 2019.

"In their final briefings, I note that the parents failed to address the application of section 355.1 and its presumption regarding these factual findings.  It is clear to this court that the nature of the injuries is such that they would ordinarily not be sustained, except as a result of unreasonable or neglectful acts or omissions.  That finding shall be prima facie evidence that the minor is a person as described in sections 300(a), (b), or (d).  And it's a presumption that shifts the burden of proof to the parents.

"As I've already noted, the parents don't really have any other explanations for how the injuries were sustained.  The Court is obviously very concerned about the severity of the injuries and the fact that the injuries are multiple, discovered in varying states of healing.  The Court agrees with the Department that without a definitive, thoroughly, substantiated explanation for the injuries, the only place for responsibility must be on the parents, who had exclusive care and custody of the child.

"That being said, the Court is also very cognizant of the parents' behavior and actions throughout the documented and charted history of this

13.

case after its filing. Their interactions with the medical teams from the very first emergency room visit and forward do not impress this Court as behaviors of willful child abusers. Their involvement with the caretaker, the maternal grandmother of the mother, and the grandmother's recounting of their visits and interactions with [M.R.] do not raise further suspicions or doubts about their caring for the child.

"Furthermore, the Court notes that there have not been any criminal referrals or investigations along that path have been closed without filings against either parent. Notwithstanding the results of the medical and genetic testing so far, the parents strike me as genuinely convinced that those are a key to the issues for [M.R.], and none of this adds up to any kind of apparent mens rea on their part.

"The specific allegations as set forth in the (a) counts, the (e) counts, and the (i) counts are troubling to the Court in their presumptive conclusions. Quite frankly, these allegations call for inferences from the circumstantial evidence that exceed the specific evidence in the record. In fact, the allegations are in conflict with each other in many respects.

"The Court does find as follows: As to the 300(b) counts, 1 and 2, it would be a dereliction of duty by this court to not find these counts to be proven by clear and convincing evidence and not merely by a preponderance of the evidence. This child has suffered serious physical harm as a result of the failure or inability of the parents to adequately supervise and protect the child. But as to the (a) count, the Court cannot find sufficient evidence to support a finding of serious physical harm, quote, 'inflicted nonaccidentally by either the mother or the father.' The facts and evidence don't substantiate a finding of specific infliction of injuries by either party.

"As to the 300(e) counts, the Court cannot agree with the Department's allegations and arguments on these issues. Yes, it is true the child is under five years of age. Yes, the child has suffered severe physical harm that fits that definition within the statute, but the (e) counts require proof of the parents inflicting abuse or ignoring the infliction of abuse by some other person. There is no evidence of that.

"Notwithstanding the authority cited by the Department and not ignoring the reasonable inferences to be drawn from the circumstantial evidence of exclusive access to the child, this court is not willing to construe an element of willfulness or knowingly inflicting to this situation

14.

based on the proof and the specific wording of the allegations as to either parent as these counts allege.

"Similarly, as to the 300(i) counts, this court refers back to these other factual determinations already stated and cannot find facts sufficient to fit the, quote, 'subjected to acts of cruelty allegations.' As to the pleadings and how they are framed in this case, the Court takes very seriously the very specific language used in each of these allegations.

"As I alluded to previously, the J.H. case states that and instructs us that in dependency litigation, the concept of due process focuses on the right to notice and the right to be heard. Except for the (b) counts, the allegations overreach to prove specifics as established in the evidence. Therefore, I am finding the (b) count to be proven true as to both mother and father. And I'm finding the (a) counts, the (e) counts, and the (i) counts not to be proven."

The court went on to advise the parents: "This child was seriously hurt and it's only because, quite frankly, that I was so specific and particular in assessing the specific allegations made that I made the findings I made. You don't get around the (b) count at all. This happened on your watch. Do you two know how seriously your son is hurt? [¶] This would have been an entirely different case if there had been a criminal referral in this matter. These were felonious injuries to that child."

### D.  *Standard of Review*

As the issue on appeal "turns on a failure of proof at trial," the question on review is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) The specific question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*)

### E.  *Analysis*

The department argues the juvenile court was compelled by the evidence to find the section 300, subdivision (e) allegations true. In the department's view, the juvenile

court explicitly found both that M.R. (1) was a child under five years of age and (2) sustained severe physical abuse. The department contends that, having made these findings, the juvenile court erroneously concluded that M.R. did not come within the court's jurisdiction under section 300, subdivision (e) because it did not properly consider whether the parents "reasonably should have known" M.R. was being abused by the other parent. That the parents "reasonably should have known" M.R. was being abused by the other parent, the department argues, was a finding compelled by the evidence.

We do not find the court displayed any misunderstanding with regard to its option of sustaining the allegations based on the fact the parents "reasonably should have known" of the abuse. Rather, we agree with the parents that the department has misinterpreted comments made by the court during its ruling, and that the court did not find M.R's injuries were caused by abuse and therefore did not reach the question of whether they "reasonably should have known" the other was abusing M.R.

The department's basis for contending the juvenile court found that M.R.'s injuries were caused by abuse is the court's comment that "[M.R.] has suffered severe physical harm that fits th[e] definition within the statute." We do not find this comment represents a finding of abuse by the parents. Notably, the court used the word "harm" rather than "abuse," and the very next words the court said were "but the (e) counts require proof of the parents inflicting abuse or ignoring the infliction of abuse by some other person. There is no evidence of that." In context, it appears that by saying the injuries "fit[] th[e] definition within the statute," the court was referring to the types of injuries listed within section 300, subdivision (e), and was not making an explicit finding regarding whether the parents inflicted abuse upon M.R. Rather, the court clearly stated when discussing the section 300, subdivision (a) allegations: "The facts and evidence don't substantiate a finding of specific infliction of injuries by either party." We presume had the court been convinced by a preponderance of the evidence that one or both of the parents had inflicted abuse upon M.R., as the department suggests, it would have found

16.

the section 300, subdivision (a) allegation true.[6] As it is clear the court found the evidence was not adequate to prove the parents inflicted abuse, it necessarily did not reach the question of whether they reasonably should have known of the abuse.

The court's conclusion the department had not proven the parents abused M.R. was not unreasonable; the court acknowledged the department presented evidence that the injuries were nonaccidental, but in weighing it against the other evidence, found the department had not met its burden of proof. The court pointed to several pieces of evidence that supported its finding that the department's burden had not been met with regard to whether the injuries were abusive in nature. First, the court discussed the parents' behavior throughout the proceedings and described them as "genuinely" convinced there was a medical reason behind M.R.'s injuries. Second, the court noted the maternal great-grandmother's testimony regarding the parents' visits and interactions with M.R. "do not raise further suspicions or doubts about their caring for the child." Third, the court noted there had been no criminal referral despite law enforcement initiating an investigation; the court raised this point again following explaining its ruling, and suggested to the parents that the court would have sustained the abuse allegations had there been a criminal referral. Though a criminal proceeding is not a prerequisite to a true section 300, subdivision (e) finding, the court was not unreasonable in giving weight to law enforcement's decision not to follow up with the matter, as it could infer from that decision that the facts did not rise to the level of "probable cause" an officer would be required to have in order to arrest an individual for a crime. Probable cause is " 'when the facts known to the arresting officer would persuade someone of

---

**6** We note the court's finding as to section 300, subdivision (a) is not challenged by the department.

"reasonable caution" that the person to be arrested has committed a crime.' " (*People v. Scott* (2011) 52 Cal.4th 452, 474.)[7]

Further, Dr. Spieren's opinion that the injuries were caused by nonaccidental trauma, while likely enough to constitute substantial evidence to support a different order, was not dispositive under the standard of *I.W.*, which requires evidence to be " 'unimpeached and uncontradicted' " and " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Dr. Spieren was subject to rigorous cross-examination of the other types of causes for the types of injuries sustained and admitted she was not an expert on determining whether an injury was accidental or nonaccidental. Dr. Shen testified he only tested for osteogenesis imperfecta, and that current testing only confirmed the disorder in 70 to 90 percent of cases. Further, the parents presented evidence that they did not inflict the injuries through mother's, Eloise's, and Nicole's testimony.

We conclude the department's focus on whether the parents "reasonably should have known" of the abuse is misplaced, as the court did not find the evidence substantiated that either parent inflicted abusive injuries onto M.R. and therefore did not have to decide that either parent knew or should have known of the abuse by the other. Still, assuming for the sake of the department's argument, the court had found M.R. had suffered abusive injuries, the evidence does not compel a finding that either parent reasonably should have known of the abuse by the other parent. There was no evidence that M.R. displayed symptoms that should have alerted the other parent to abuse, which

---

[7] This standard is arguably lower than the preponderance of the evidence standard required to make jurisdictional findings. " 'Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence … have no place in the [probable-cause] decision.' [Citation.] All we have required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.' " (*Florida v. Harris* (2013) 568 U.S. 237, 243–244.)

18.

would have been key evidence to support an inference that each parent "reasonably should have known" of the abuse by the other parent.

*E.H.*, *supra*, 108 Cal.App.4th 659, relied on by the department on appeal and below, is distinguishable.  In *E.H.*, an infant sustained multiple rib, wrist, femur, feet, hands, and hip fractures at different stages of healing ranging from one to six weeks old.  (*Id*. at p. 661.)  The child welfare department filed a dependency petition alleging the minor came within the juvenile court's jurisdiction under section 300, subdivisions (a), (b), (e), (i), and (j).  (*E.H.*, at p. 661.)  A doctor who examined the minor diagnosed her with mild osteopenia, which is a slight lack of bone density, but concluded the condition would not have caused the fractures that were likely nonaccidental.  (*Id*. at pp. 661–662.)  The mother lived with several family members and denied that anyone in her household would hurt the minor.  (*Id*. at p. 662.)  The court found the injuries were intentionally inflicted and were caused by someone in the household, but there was no evidence establishing who injured the minor or that anyone knew anything was happening to the minor.  The court sustained the petition as to section 300, subdivisions (a), (b), and (j), but dismissed the allegations under subdivisions (e) and (i).  (*E.H.*, at p. 667.)

The department appealed, arguing the court erred in dismissing the section 300, subdivision (e) allegation because there was no identified perpetrator.  (*E.H.*, *supra*, 108 Cal.App.4th at p. 667.)  The appellate court reversed, finding "the only reasonable conclusion which may be drawn from the evidence is that [the parents] *reasonably* should have known [the minor] was being physically harmed by someone in the house … []since they lived there[]."  (*Id*. at p. 670.)  The appellate court pointed out the evidence showed the minor was "never alone," and that the parents never followed up on the fact that the minor cried whenever she was handled.  (*Ibid*.)  The appellate court found the juvenile court erroneously concluded the statute required actual knowledge.  (*Ibid*.)

Here, as discussed, the juvenile court did not make a finding the injuries were inflicted by abuse and, unlike in *E.H.*, there was no evidence that M.R. had any injuries

19.

that would have alerted the parents to abuse by the other.  There is no evidence the parents ignored symptoms like in *E.H.*; rather, they responded to any symptom M.R. suffered by bringing him in for care.  As the same court who decided *E.H.* later stated in *In re Roberto C.* (2012) 209 Cal.App.4th 1241:  "The recognition that circumstantial evidence may support a finding despite the inability to identify the perpetrator does not, however, lead to the conclusion that a court may presume both that the parents knew, or should have known that the child was injured, and knew, or should have known who the perpetrator was, to support a finding against the parents."  (*Id.* at p. 1255.)

Neither a finding that M.R.'s injuries were inflicted by abuse nor that the parents reasonably should have known the other parent was abusing M.R. by way of them living in the same home is compelled by the evidence on this record.  We find no error.

As we have discussed, we do not reach the department's argument that the court erred by failing to apply the section 361.5, subdivision (b)(5) bypass provision because, as the parents have since completed services and M.R. had been returned to them, there is no practical relief we could grant, and the issue is now moot.

## **DISPOSITION**

The juvenile court's findings and orders at the combined jurisdiction/disposition hearing are affirmed.


DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


MEEHAN, J.

20.