JUDGE, COMMONWEALTH vs., 100 Mass. App. Ct. 817

 
 COMMONWEALTH vs. ELIJAH JUDGE.

100 Mass. App. Ct. 817
 October 22, 2021 - April 7, 2022

Court Below: District Court, Barnstable Division
Present: Green, C.J., Singh, & Grant, JJ.

 

20-P-1293 

Controlled Substances. Search and Seizure, Probable cause, Reasonable suspicion, Trained dog. Probable Cause. Constitutional Law, Investigatory stop, Probable cause, Reasonable suspicion. Practice, Criminal, Motion to suppress. Evidence, Tracking by dog.

There was no error in the denial of a criminal defendant's pretrial motion to suppress evidence discovered after a police dog alerted to the odor of narcotics on the defendant's person, where the moment of seizure did not occur until a police officer alighted from his cruiser and commanded the defendant to place his hands on the hood of a vehicle in which he had been previously sitting [819-821]; where, in the circumstances of the case at the moment of seizure, the officer had reasonable suspicion that he had witnessed a drug transaction, which strengthened into probable cause to believe that the defendant had engaged in a street-level drug transaction when the officer observed white powder on the vehicle's console adjacent to where the defendant had been sitting moments before [821]; and where there was probable cause for a strip search of the defendant, in that the Commonwealth sufficiently established the reliability of the dog's alert [821-826].

COMPLAINT received and sworn to in the Barnstable Division of the District Court Department on June 25, 2018. 

 A pretrial motion to suppress evidence was heard by John M. Julian, J., and a conditional plea of guilty was accepted by Joseph P. Harrington, J. 

 Patrick Levin, Committee for Public Counsel Services, for the defendant.

 Karen A. Palumbo, Assistant District Attorney, for the Commonwealth.

 SINGH, J. After a police dog "alerted" to the odor of narcotics on the defendant's person, the defendant was strip searched. The search revealed a package, suspected to contain narcotics, located in the cleft between the defendant's buttocks. The defendant was charged with possession of a class B controlled substance with intent to distribute. He filed a motion to suppress evidence of the 

 Page 818 

drugs, which was denied by a District Court judge. The defendant entered a guilty plea to simple possession, conditioned on his right to appeal the denial of his motion to suppress. See Commonwealth v. Gomez, 480 Mass. 240, 240-241 (2018); Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019). On appeal, the defendant contends that his motion to suppress was improperly denied because (1) the police lacked reasonable suspicion to conduct an investigatory stop, and (2) the police conducted a strip search without probable cause. We affirm.

 Background. The undisputed facts are as follows. At approximately 1:45 a.m. on June 25, 2018, a Barnstable police officer was on patrol in downtown Hyannis when he noticed a group of five or six people gathered in the parking lot of a hotel. The police officer had previously participated in narcotics investigations at this particular hotel and the Barnstable police considered it to be a "problem property." The officer drove through the parking lot and passed by the group, and then parked his cruiser across the street in order to conduct surveillance. For the next hour, and with the assistance of binoculars, the officer observed the group of people. Although the group remained in the parking lot, the officer also observed that members of the group would occasionally enter two vehicles -- a Chevy Impala and a Honda Pilot -- either to retrieve an object or to sit inside.

At approximately 3 a.m., the officer watched as a woman got out of the passenger seat of the Impala and walked to its trunk. The defendant met her there, and the woman reached into the trunk and retrieved an item that appeared to be a small handbag. Both the defendant and woman appeared to be "looking around" as if they were "conducting counter surveillance." The woman handed the item to the defendant, who then got into the driver's seat of the Impala while the woman waited outside the door. When the defendant emerged from the car, the woman got into the driver's seat, the two trading places. Believing that he had just witnessed a drug transaction, the officer radioed dispatch to request assistance.

 The group, however, began to disperse before additional officers arrived. The officer drove into the parking lot and parked his cruiser near the Impala, illuminating the area with the cruiser's white lights. He stepped out of his cruiser, and as he approached the Impala, he saw a "white powdery substance" on the center console. The officer ordered the members of the group to stop and commanded those standing outside the vehicles, including the 

 Page 819 

defendant, to put their hands on the hood of the Impala. Shortly thereafter, when additional officers arrived at the scene, the defendant and the others were handcuffed, pat frisked, and placed into separate police vehicles.

 After the defendant was secured, a canine officer was summoned. The canine officer directed his dog to sniff the defendant for narcotics. After the dog alerted to the defendant's backside, the defendant was transported to the police station, where officers asked him to remove his shirt, pants, and undergarments. An item that "looked like drug packaging material," and which the officers believed to be cocaine, protruded from the area between the defendant's buttocks. 

 Discussion. "When reviewing the denial of a motion to suppress, we accept the motion judge's findings of fact absent clear error, but independently review the judge's ultimate findings and conclusions of law." Commonwealth v. Tejada, 484 Mass. 1, 7, cert. denied, 141 S. Ct. 441 (2020). Accord Commonwealth v. Sanders, 90 Mass. App. Ct. 660, 664-665 (2016). 

 1. Validity of the stop. a. Moment of seizure. The defendant argues that he was seized at the outset of the encounter with police, when the officer parked his cruiser near the Impala and illuminated the area with the cruiser's white lights. The Commonwealth argues that the seizure did not occur until after the officer alighted from his cruiser and commanded the defendant to place his hands on the hood of the Impala.

 "A person is seized in the constitutional sense when 'an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay.'" Commonwealth v. Chin-Clarke, 97 Mass. App. Ct. 604, 608 (2020), quoting Commonwealth v. Matta, 483 Mass. 357, 362 (2019). "We interpret the officer's actions based on the totality of the circumstances surrounding the encounter." Commonwealth v. Evelyn, 485 Mass. 691, 697 (2020). "'[Article] 14 [of the Massachusetts Declaration of Rights] provides more substantive protection than does the Fourth Amendment [to the United States Constitution] in defining the moment' of seizure"; thus, determining the moment of seizure under "the more stringent standards of art. 14" necessarily satisfies the standards of the Fourth Amendment. Commonwealth v. Browning, 99 Mass. App. Ct. 735, 740 (2021), quoting Commonwealth v. Lyles, 453 Mass. 811, 812 n.1 (2009).

 The defendant points to the officer's "swift" approach in a marked police cruiser and the officer's decision to park behind the

 Page 820 

 Impala and illuminate the area with the cruiser's floodlights. Certainly, the manner in which a police officer approaches a suspect may constitute a seizure requiring reasonable suspicion, but the facts of this case do not persuade us that the initial approach was "sufficiently confrontational" such that it implicated art. 14. Commonwealth v. Campbell, 69 Mass. App. Ct. 212, 215 (2007). See Commonwealth v. Stoute, 422 Mass. 782, 789 (1996) ("not every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions").

 First, the judge did not make a specific finding that the officer used his cruiser to "block [the Impala] from leaving" and, indeed, the officer testified to the contrary. [Note 1] An appellate court may not "engage in . . . independent fact finding in order to reach a conclusion of law that is contrary to that of a motion judge who has seen and heard the witnesses, and made determinations regarding the weight and credibility of their testimony." Commonwealth v. Jones-Pannell, 472 Mass. 429, 438 (2015). Furthermore, and unlike in the cases cited by the defendant, the defendant was no longer seated in the Impala when the officer approached the group. Even supposing that the officer had parked his cruiser in a way that prevented the Impala from leaving, the defendant's movement would not have been obstructed. See Matta, 483 Mass. at 365. 

 Second, the officer's use of the cruiser's white lights to illuminate the area did not constitute coercive police power. See Commonwealth v. Briand, 71 Mass. App. Ct. 160, 162-163, S.C., Commonwealth v. Clark, 452 Mass. 1022 (2008). Contrast Commonwealth v. Smigliano, 427 Mass. 490, 492 (1998). Rather, we agree with the Commonwealth that the moment of seizure occurred when the officer ordered the defendant to place his hands on the hood of the Impala. At that point, "a reasonable person 

 Page 821 

would understand [the officer's instruction] as a command that would be enforced by the police power." Commonwealth v. Barros, 435 Mass. 171, 176 (2001). 

 b. Justification for the stop. Having determined the moment of seizure, we next consider whether the officer's actions were justified. See Commonwealth v. Gomes, 453 Mass. 506, 510 (2009). "Whether a stop is a seizure, requiring reasonable suspicion, or an arrest, requiring probable cause, depends upon the circumstances of each case." Commonwealth v. Manha, 479 Mass. 44, 48 (2018). "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense" (citation omitted). Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992).

 Here, the officer knew from personal experience that the hotel was a common location for suspected drug transactions. The officer observed the defendant and his companion conduct "counter surveillance" while the two retrieved an item from the Impala's trunk. Each then took a turn sitting in the driver's seat with that item. Based on this unusual sequence of events, it was reasonable for the officer to believe that he had just witnessed a drug transaction. See Commonwealth v. Freeman, 87 Mass. App. Ct. 448, 451 n.2 (2015).

 This suspicion strengthened into probable cause when, prior to the moment of seizure, the officer observed white powder on the Impala's console adjacent to where the defendant had been sitting just moments before. See, e.g., Commonwealth v. Franco, 419 Mass. 635, 640 (1995). At that time, the facts known to the officer established probable cause to believe that the defendant had engaged in a street-level drug transaction. Cf. Commonwealth v. Washington, 449 Mass. 476, 486 (2007) ("the police need not arrest a suspect the moment they obtain probable cause").

 2. Strip search. The defendant sought to suppress evidence that was seized after the police discovered, pursuant to a strip search, [Note 2] a package concealed in the cleft between the defendant's buttocks.

 Page 822 

 The Commonwealth relies wholly on the dog's alert to establish probable cause for the strip search. On appeal, the defendant argues that the Commonwealth failed to present evidence that an alert by the dog was sufficiently reliable such that it could establish probable cause to conduct a strip search. [Note 3] Absent such a showing, the defendant contends, the State and Federal Constitutions require suppression of the fruits of the illegal search.

 As noted supra, the police had probable cause to arrest the defendant on drug charges and consequently were justified in conducting a search of the defendant incident to that arrest. A strip search of an arrestee, however, "constitute[s] a substantial intrusion on one's personal privacy rights," Commonwealth v. Prophete, 443 Mass. 548, 553 (2005), and is constitutionally impermissible absent a "particularized indication of concealment." Commonwealth v. Agogo, 481 Mass. 633, 639 (2019). Thus, art. 14 requires the police to possess probable cause to believe that the defendant is concealing contraband that the police "could not reasonably expect to discover without forcing the arrested person to discard all of his or her clothing." Agogo, supra at 637, quoting Prophete, supra at 556. "Probable cause requires some affirmative indication that drugs or other contraband are being concealed 

 Page 823 

in areas such as the crotch or groin." Agogo, supra at 638. 

 Whether a drug-detecting dog's alert to an individual's private area establishes probable cause for a strip search necessarily depends on the reliability of the alert. See Commonwealth v. Overmyer, 469 Mass. 16, 21 (2014) (discussing whether police officers can reliably predict quantity of marijuana through sense of smell so as to provide probable cause to search for criminal amount of marijuana), citing Commonwealth v. Antobenedetto, 366 Mass. 51, 56 n.2 (1974) ("The foundation of probable cause must be specific data, the reliability of which could be judged by a magistrate"). 

 Here, the Commonwealth presented the testimony of Barnstable Police Officer Kevin Fullam to establish reliability of the dog's alert. Officer Fullam had been a police officer for eight years and a narcotics dog handler for the past three years. Prior to being assigned the position of narcotics dog handler, Officer Fullam attended over 480 hours of training with his canine partner, a female "English line black lab," under the supervision of the individual who ran a program known as Alpha Canis. The program consisted of observation as well as leash time (handler with dog) and involved training the dog to recognize narcotics odors and to indicate on those odors. The training progressed to the point where Officer Fullam and the dog could go into a "blind room," where neither knew where drugs had been hidden, and "certifying" that the dog could find the drugs and that Officer Fullam could recognize the dog's indications. Officer Fullam and the dog thereafter kept current on their skills by attending bimonthly trainings through the police department.

 Officer Fullam explained that as a result of the training, the dog was conditioned to respond to the odor of narcotics through a food reward. The dog did not eat unless she participated in a search for narcotics, so she trained every day. On a daily basis, Officer Fullam hid narcotics and then readied the dog for a search. Officer Fullam went through a sequence of events, the same each time, to signal to the dog that a search was about to begin. Although the search protocol was consistent, the actual search itself was not; Officer Fullam hid the drugs in different ways, mixing up scenarios so that the dog would be ready for anything. When the dog detected the odor of narcotics, she exhibited changes in her behavior, including the way she carried her body, her breathing, and her level of salivation as she anticipated a food reward. When she settled on the source of the odor, she got her 

 Page 824 

nose as close as she could to the source and became still, her final indication. These were all conditioned responses through her training. [Note 4] The dog was never fed during a live search because it was not a controlled setting; the point was to keep the training "pure." Officer Fullam testified that through the daily exercises, the dog was "never wrong because she[] show[ed] a pattern every, single day of doing the right thing."

 With respect to the dog's search at the scene, Officer Fullam testified that he went through the same sequence he went through each time the dog prepared for a search. The dog was first tasked with searching one of the other individuals who had been detained. After the dog gave no indication, that individual was removed from the immediate area. Subsequently, the defendant was presented to the dog for a search; this time, the dog had a marked change in her behavior -- her breathing changed and she began salivating. She paced around but kept focusing on the defendant's waistband and midsection area. Finally, the dog "sat on the ground and she continued to nudge her nose to [the defendant's] buttocks." The defendant then was taken to the police station for the strip search. [Note 5] Based on this evidence, the judge found the reliability of the dog's alert to have been established.

 Relying on Florida v. Harris, 568 U.S. 237 (2013), the defendant argues that the judge erred in finding the dog's alert to be reliable, because there was no evidence of the dog's certification by a bona fide organization, no evidence of what standards a dog and handler team are required to attain in order to successfully complete training, and no training records related to the dog introduced in evidence. He argues that the absence of records or other information reflecting training standards or the dog's error rates requires suppression. Yet, the Supreme Court did not specify 

 Page 825 

what particular evidence must be presented in order to establish reliability of a dog alert; to the contrary, it specifically rejected an "inflexible checklist" approach. Id. at 245.

 By way of example, the Court suggested that reliability could be established by "evidence of a dog's satisfactory performance in a certification or training program," Harris, 568 U.S. at 246, or "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting," id. at 246-247, or "even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated h[er] proficiency in locating drugs," id. at 247. Ultimately, the Court held that "[i]f the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." Id. at 248. The Court emphasized that the question, like any inquiry into probable cause, "is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Id. 

 Here, the Commonwealth presented evidence that the dog (together with Officer Fullam, her handler) had received extensive training from an independent program even prior to being put to work for the police department as a drug-detecting team. The training culminated in certifying, in a controlled setting, that the team could successfully detect drugs. The team had worked together for three years prior to the suppression hearing, and during that time, had engaged in bimonthly continuing education trainings through the police department. Finally, due to the dog's food reward system, her accuracy in detecting drugs in a controlled setting was established on a daily basis.

 On cross-examination, the defendant did not challenge the quality or standards of the training programs or the dog's performance in them. See Harris, 568 U.S. at 247 (defendant may contest adequacy of training programs or examine how dog and handler performed in those settings). The defendant also did not inquire into the dog's past performance in the field or raise any questions concerning the soundness of the particular search in the case. See id. (defendant may ask handler about past field performance or undermine particular search by pointing out flaws).

 As the Commonwealth "produced proof from controlled settings that [the] dog perform[ed] reliably in detecting drugs," and the defendant did not contest that showing by way of cross-

 Page 826 

examination or independent proof, the judge was warranted in finding probable cause. Harris, 568 U.S. at 248. As the Supreme Court noted, "a well-trained dog's alert establishes a fair probability -- all that is required for probable cause -- that either drugs or evidence of a drug crime . . . will be found." Id. at 246 n.2. [Note 6] 

 Conclusion. The order denying the defendant's motion to suppress is affirmed.

So ordered.

FOOTNOTES
[Note 1] The defendant provided a video recording (video) that he claims contradicts the testimony of the officer and the judge's findings. However, this is not a case where we should "independently review [the] documentary evidence" and set aside our traditional standard of deferential review of the findings which draw upon that evidence, because it does not appear that the video exhibit provided a basis for any of the judge's findings of fact. Commonwealth v. Tremblay, 480 Mass. 645, 654-655 (2018). Nor do we assign the video the significance that the defendant urges us to. The video begins after the point at which the officer first parked his cruiser in the hotel's parking lot and after additional officers had arrived at the scene. It provides no information as to the position of the defendant or the officer's cruiser at the outset of the encounter. 

[Note 2] "A strip search occurs when 'the last layer of clothing of a detainee [is] removed,' or 'when a detainee remains partially clothed, but . . . a last layer of clothing is moved (and not necessarily removed) in such a manner whereby an intimate area of the detainee is viewed, exposed, or displayed.'" Commonwealth v. Jeannis, 482 Mass. 355, 358 (2019), quoting Commonwealth v. Morales, 462 Mass. 334, 342 (2012). 

[Note 3] The Commonwealth argues that the defendant waived the issue of the dog's reliability by failing to challenge it specifically in his motion. See Mass. R. Crim. P. 13 (a) (2), as appearing in 442 Mass. 1516 (2004) ("pretrial motion shall state the grounds on which it is based . . . which shall be set forth with particularity," otherwise grounds "shall be deemed to have been waived"). The defendant's motion sought to suppress "a quantity of white powder, cash, and a cell phone" seized in violation of the Fourth Amendment and art. 14. His supporting affidavit alleged that the police stopped, interrogated, searched, and arrested him without showing him a warrant. Although neither the motion nor the affidavit specifically mentioned the dog or its reliability, "a quantity of white powder" was seized directly from the defendant's person as a result of a strip search, which was undertaken because of the dog sniff. Thus, the Commonwealth was on notice that it would have to establish the requisite justification for the warrantless strip search. See Commonwealth v. Mubdi, 456 Mass. 385, 389 (2010) ("the detail required in the motion and accompanying affidavit under rule 13 (a) (2) must be sufficient to . . . enable a judge to determine whether to conduct an evidentiary hearing . . . [and] to give fair notice to the prosecution of the particular search or seizure that the defendant is challenging"). Moreover, at the beginning of the suppression hearing, the defendant made clear that he was looking to suppress items seized from his person. Additionally, when the defendant argued in closing that the Commonwealth had failed in its burden to establish the dog's reliability, the Commonwealth did not contend that the issue was waived. See id. at 390-391 (Commonwealth, having failed to object to lack of particularity in defendant's suppression motion, waived issue on appeal). 

[Note 4] Officer Fullam explained that all dogs are individuals and may have different ways of responding; he gave the example of another dog he worked with that had different responses to the detection of drug odors. A handler learns not only from training but also from experience with a particular dog. As Officer Fullam put it, "[T]he dog is a tool to expedite a searcher to find the narcotic odor. . . . I can read the dog." 

[Note 5] The dog remained on scene and searched another individual, giving no response; that person was then removed from the immediate area. The dog then searched the Impala. After walking around the car, the dog showed a behavior change on the front driver's side door. Officer Fullam then opened the door to the Impala and let the dog inside. After exploring the interior of the car, the dog came back to the front driver's side floorboard and indicated on a purse that was there by nuzzling her nose as close as possible; police found drugs inside the purse. 

[Note 6] Relying on Commonwealth v. Ramos, 72 Mass. App. Ct. 773, 781 (2008), the defendant argues that a "well-trained and experienced canine that received ongoing training from a competent handler" does not suffice for probable cause under art. 14. Ramos concerned review of probable cause for a search warrant where the supporting affidavit contained material omissions, neglecting to mention information about false positives, and material misstatements, exaggerating that dog's active duty achievements. See id. at 779-781. Therefore, while the dog in that case was trained and experienced, its reliability was specifically impeached. The court noted that this factor distinguished it from State and Federal cases in which alerts from drug dogs had been found to provide probable cause to search. See id. at 779 n.5. Unlike the dog in Ramos, the reliability of the dog in the case before us was not specifically impeached. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.